IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GARY W. YOUNGBLOOD,           )
                              )
          Plaintiff,          )
                              )
     v.                       )     CIVIL NO. 2:15-cv-214-MHT
                              )
ALA. DEPT. OF CORRECTIONS, et al.,   )
                              )
          Defendants.         )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff Gary W. Youngblood is a former[1] inmate of the Alabama Department of

Corrections at Easterling Correctional Facility ("Easterling") in Clio, Alabama. He filed

this action under 42 U.S.C. § 1983, alleging that prison officials unconstitutionally

prevented him from using money in his prison account to pay a patent application fee, did

not mail the complaint in this case in time to meet a patent application deadline, and

prevented him from using the law library.[2] Docs. 1, 2, 14, 15. Plaintiff names as defendants

the Alabama Department of Corrections, Willie Bryant, Carter Davenport, Derrick Carter,

---

[1] In February 2017, Plaintiff informed the court of his new address, which is not in the Department of Corrections. Doc. 119.

[2] To the extent that Plaintiff raises additional allegations of constitutional violations in his opposition that were not affirmatively pled in his complaint, he may not "amend" his complaint through his opposition by raising a new claim. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (rejecting a new basis for a pending claim raised during summary judgment proceedings). The court, therefore, addresses Plaintiff's claims as alleged in the complaint and amendment, and considers the facts only to the extent that they support these claims. *See Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not amended the complaint).

Nathaniel Lawson, Gerald Wagner, and Phelix Woods, in their official and individual capacities. *Id.* He requests injunctive relief and damages.[3] Doc. 1 at 1, 13-14; Doc. 14 at 3.

Defendants filed an answer, special report, supplemental reports, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 18, 25, 31, 55, 91, 115. Upon receipt of the defendants' reports, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Plaintiff that "at some time in the future the court may treat the defendants' reports and the plaintiff's response as a dispositive motion and response." Doc. 33. Plaintiff responded to the defendants' reports and materials. Docs. 21, 22, 28, 29, 32, 36, 40, 41, 44, 47, 48, 107, 116, 117, 118. The court denied Plaintiff's requests to file a motion for summary judgment, but advised that prior to disposition of the case, the court would reconsider Plaintiff's motion. Docs. 101, 109.

The court now reconsiders Plaintiff's motion for summary judgment, and it will also treat the defendants' reports as a motion for summary judgment. Upon consideration of the motions, the parties' responses, and the evidentiary materials filed in support and in opposition to the motion, the court concludes that Plaintiff's motion for summary judgment is due to be denied, and the defendants' motion for summary judgment is due to be granted.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no

---

[3] The court previously denied Plaintiff's requests for preliminary injunctive relief, and the Court of Appeals upheld the denial. Docs. 20, 24, 45, 58, 63, 104.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted; "issue" altered to "dispute" to reflect the stylistic change in the current rule). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may … grant summary judgment if the motion and supporting

materials—including the facts considered undisputed—show that the movant is entitled to it … .”); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (court considers facts pled in a plaintiff's sworn complaint when considering his opposition to summary judgment”). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence “is merely colorable … or is not significantly probative … summary judgment may be granted.” *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e). “A mere ‘scintilla’ of evidence supporting the opposing party's position will not suffice … .” *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment “must do more than simply show that there is some metaphysical doubt as to the material facts… . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no ‘genuine [dispute] for trial.’” *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

“The evidence of the non-movant is to be believed, and all justifiable inferences are

4

to be drawn in his favor." *Anderson*, 477 U.S. at 255. Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Plaintiff fails to demonstrate a genuine dispute of material fact so as to preclude summary judgment on his claims against the defendants. *See Matsushita*, 475 U.S. at 587.

### III. SUMMARY OF MATERIAL FACTS

For purposes of considering the defendants' motion for summary judgment, the court views the facts in the light most favorable to Plaintiff, the nonmoving party.

Plaintiff was an inmate at Easterling in 2015. He now resides at an address outside the custody of the Alabama Department of Corrections. Docs. 1, 119. During the time relevant to his claims, the defendants were employed by the Alabama Department of Corrections at Easterling. Davenport was a Correctional Warden III, Carter was a Correctional Warden I, Woods was a Correctional Lieutenant, Lawson and Bryant were Correctional Captains, and Wagner was a Correctional Officer. Docs. 25-1, 25-2, 25-4, 25-5, 25-6, 26-7.

### A. Patent Application

In his verified complaint, Plaintiff alleges that he developed an idea he wanted to patent while he was at Easterling, and he filed an application for a patent with the United

States Patent and Trademark Office ("USPTO"), application number 62/125,184, on October 31, 2014.[4] Docs. 1 at 17, 2 at 1. Plaintiff's patent "would allow First Responder, wrecker, escort, and road work vehicles, stopped school buses, + even trains to give motorist in vicinity advance notice of their presence and or approach, using radio frequency technology." *Id.* at 4. "Due to the substantial impact to public safety possible from such a system," Plaintiff tested his theory using electronics he purchased at Easterling. *Id.* Plaintiff states that he desired to protect his patent, which he views as his personal intellectual property. *Id.* at 4-5. He wanted to ensure that prison personnel, other inmates, and others could not steal it. Doc. 21-1 at 1. Plaintiff believes that his invention may have commercial potential, but he also indicates that his patent application is a means to protect his personal intellectual property. Doc. 1 at 11. Plaintiff says that "patent could prove to be extremely valuable to plaintiff and public safety as well," and represents that he is not subject to any forfeiture proceedings that would permit his property to be taken. Doc. 14 at 3.

Plaintiff tried to obtain a waiver of the fees for the patent, but the agencies he contacted wanted to be involved in development, and Plaintiff did not want to share the idea until he had patent protection. Doc. 1 at 5-6. He asked his sentencing court to alter his consecutive sentences to run concurrently so that he could prosecute and fund his patent application and process. *Id.* at 6. Plaintiff did not pay all the filing fees for his patent, and

---

[4] Plaintiff also refers to events concerning USPTO application number 14/544,189, filed on Dec. 8, 2014. Doc. 47-1 at 3. On June 8, 2015, the USPTO sent Plaintiff a Notice of Abandonment. *Id.* The Dec. 8, 2014, application is not the subject of this lawsuit.

he states that his patent was subject to abandonment for failure to pay the fees on April 3, 2015. Doc. 1 at 2.

On March 3, 2015, the USPTO sent Plaintiff a Notice of Incomplete Reply (Provisional), indicating that he was required to pay an $80 balance for fees within two months to avoid abandonment of the application. Doc. 1 at 17. On March 7, 2015, Plaintiff submitted a request to the Easterling business office to deduct money from his Prisoners' Money on Deposit ("PMOD") account for the filing fees and send it to the USPTO in a stamped envelope that Plaintiff provided. Doc. 21-3 at 1-2. Plaintiff states that Lieutenant Woods verified and approved the request on March 9, 2015. *Id.* at 1.

According to Woods, Warden Carter asked Woods to question Plaintiff about the request to withdraw funds, and Plaintiff said he needed $250.00 to pay legal fees to the USPTO to protect his personal property. Doc. 25-4. Woods states that he verified Plaintiff's account and withdrawal slip, then initialed the request and turned it over to Carter for further review. *Id.* Woods maintains that Warden Carter's decisions are not Woods' responsibility. Doc. 55-4 at 9.

On four more occasions in March 2015, Plaintiff requested that the USPTO fees be deducted from his PMOD and mailed. Doc. 1-1 at 1-4. Carter denied the requests. *Id.* Carter states that the requests were denied because institutional rules do not list patent applications among the items that inmates may purchase, the transaction was not labeled legal mail, Plaintiff did not follow institutional rules and standard operating procedures or have prior authorization for an exception to the rules, and the administrative regulations "indicate[]

7

no provisions for incarcerated felons to engage in business transactions." Doc. 25-2 at 1. In his answers to Plaintiff's interrogatories, Carter reiterates that "[a]ccording to ADOC policies and procedures, inmates are NOT allowed to engage in business transactions." Doc. 55-4 at 3.

Carter states that he briefed Davenport that the transaction was seen as a business transaction, and that according to ADOC policy, inmates are not allowed to engage in business transactions. Doc. 55-4 at 3. Davenport states that he did not deny Plaintiff's request for a fund withdrawal from his PMOD account. Doc. 25-1. In his answer to Plaintiff's interrogatories about the PMOD withdrawal, Davenport says that he did not have a belief relevant to the matter. Docs. 38-1, 55-4 at 1-2.

On April 14, 2015, the USPTO sent Plaintiff a Notice of Incomplete Reply (Provisional), stating that he was required to pay an $80 balance for fees within two months. Doc. 116-1 at 4. On April 21, 2015, Plaintiff filed a request to deduct $265 from his PMOD account and mail it to the USPTO. Doc. 116-1 at 1-6. On May 22, 2015, the USPTO sent Plaintiff a Notice of Incomplete Reply, indicating that Plaintiff's May 15, 2015, reply was late and that extensions would not be granted more than five months after the Notice of Incomplete Reply. Docs. 36-1 at 4, 116-2 at 4. Plaintiff's Notice was first mailed February 3, 2015, so the last date for his extension was September 3, 2015. *Id.* The May 22, 2015 Notice included a schedule of fees for extensions, from $50 for a one-month extension, to $750 for a five-month extension. *Id.*

8

Plaintiff asserts that the defendants restricted his PMOD account so that no one could put funds in it. Doc. 21-3 at 1. When a friend tried to put money in it, he was told the account had the maximum amount of funds in it. *Id.* Plaintiff disputes the statement that his PMOD had the maximum amount of funds in it. Of the $265.27 then in the account, $265.00 was earmarked for the USPTO. *Id.* at 2. Plaintiff believes that the defendants intended Plaintiff to spend some of his PMOD funds, which would make him unable to pay the USPTO fee, which would in turn cause him to lose his patent application and moot his claims. *Id.*

Under Standard Operating Procedure ("SOP") D-52 § III(D)(2), which regulates inmate PMOD accounts, funds may be deducted from the PMOD account for "[b]ooks, magazines, newspapers, etc.[,] [h]obbycraft supplies[,] [t]ennis shoes[, and] [o]ccasional personal expenses (attorney fees, etc.) or expenses of a family member... . " Docs. 25-2 at 5, 55-2 at 33 (dated Feb. 26, 2003). Regulations also specifically allow inmates to sell hobbycraft items. Docs. 38-1 at 3, 55-4 at 2, 4. Alabama Department of Corrections Administrative Regulation ("AR") 112 regulates procedures for court-ordered withholding from PMOD accounts. Doc. 115-2 at 1-7 (dated July 26, 2004). According to the Inmate Handbook, inmates "are not allowed to enter into contracts, business agreements or participate in any business activity while you are an inmate at an ADOC institution." Doc. 55-2 at 40 (dated Aug. 1, 2013) (capitalization and boldface removed).

Under AR 338 § III(F), which regulates inmate property and items that inmates may keep as property, "legal papers" are defined as "[p]leadings and resource documents

relevant to current cases, such as case law, court rules, statutes, transcripts, or legal forms." Doc. 25-2 at 8, 55-2 at 2 (dated Sept. 9, 2009). Under AR 448 § III(G), which regulates inmate mail, "legal mail" is defined as "[l]etters to and from attorneys, courts, judges, clerks, and other officials of the court and government agencies." Doc. 55-2 at 19 (dated Oct. 20, 2008). According to the Inmate Handbook, "'[l]egal mail' is considered to be any mail to and from attorneys, courts, judges, clerks, and other officials of the courts and government agencies and it must be verified." Doc. 55-2 at 38.

Captain Lawson states that while he was on the exercise yard, Plaintiff approached him and showed him two requests for withdrawals from his PMOD that had been denied. Doc. 25-5. Lawson says that he does not approve or disapprove withdrawals to PMOD accounts to send money outside the institution, and that this is done at the Warden's level. *Id.* Lawson does not recall saying that the Warden must have forgotten to give an explanation. He denies that Plaintiff was called to his office to discuss the matter. Lawson states that the only knowledge he has of the denial to send out Plaintiff's funds was shown to him by Plaintiff on his fund request slips. *Id.* Lawson states that it is not his position to question the Warden's decision. *Id.*

Captain Bryant says that Plaintiff approached him with a denied PMOD request slip. Doc. 25-6. Bryant states that he advised Plaintiff that Bryant could not grant Plaintiff's request, and that Bryant told Plaintiff he would need to ask the Warden for an explanation. Bryant avers that it is untrue that he tried to defend the Warden's action. *Id.* Bryant agrees that he asked the Warden about the requested denial, but states that he could not overturn

the Warden's decision. Bryant indicates that he explained to Plaintiff that the Warden's decision stands. Bryant denies getting upset or aggressive with Plaintiff, and denies violating Plaintiff's constitutional rights. *Id.* Bryant states that Carter is his supervisor on this issue. Doc. 55-4 at 7.

### B. Law Library

Plaintiff claims that he asked Wagner, the legal resources officer in the law library, about applying for a patent, and that Wagner said, "'no regulation prevents an inmate from protecting his property.'" Doc. 1 at 5. Plaintiff asserts that Wagner later ordered inmate law clerks not to allow Plaintiff to use law library resources because Plaintiff was researching patent law instead of criminal law. Doc. 1 at 10.

Plaintiff states that inmates Tequan Graham and Thomas Jones were involved and were witnesses to these events. Doc. 1 at 10; Doc. 41-1 at 1. Plaintiff submitted statements[5] by Graham and Jones (the chief law library clerk) indicating that Wagner told the law clerks not to hand out materials or information unless approved by Wagner or Woods. Doc. 55-1 at 1-2. Jones further states that Jones never told Plaintiff that Woods or Wagner would retaliate against Jones or other law clerks. *Id.*

---

[5] The statements from Graham and Jones are not sworn or made under penalty of perjury under 28 U.S.C. § 1746. Unsworn statements may not be considered as evidence in ruling on the motion for summary judgment. *See McCaskill v. Ray*, 279 F. App'x 913, 915 (11th Cir. 2008) (litigant's unsworn allegations were not admissible on motion for summary judgment where litigant did not attempt to make the declarations under penalty of perjury). Nevertheless, under Fed. R. Civ. P. 56(e), when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion … ." The court considers the statements by Graham and Jones undisputed for purposes of the motion.

Wagner denies advising Plaintiff of any laws pertaining to patent regulation. Doc. 25-7. Instead, Wagner states that he told Plaintiff he would have to contact the USPTO for any patent information. Wagner asserts that Plaintiff has never been denied use of the law library to protect his intellectual property and could use the library whenever he submitted a request form for a date and time on which the law library was open. *Id.* Defendants submitted records of the inmates who used the law library from January through March 2015. Doc. 25-3. It appears from the documents that Plaintiff's name is on them, but the name has been either highlighted or blocked out, and it is not possible to read the names clearly on all of the e-filed documents. *Id.* The records also include requests for Plaintiff to use the law library on various dates from January to mid-April 2015, and many of them are marked, "OK." *Id.* at 2-40. Wagner states that he was not involved in the decisions regarding Plaintiff's PMOD or mail. Docs. 38-6, 55-4 at 11-12.

Carter  that indicates that the law library is available for use on a weekly basis, the hours are posted in the library, and to his knowledge no inmates have been denied access to the law library. Doc. 25-2 at 1. Davenport, Bryant, Lawson, and Woods state that they were not involved in the events concerning the law library. Docs. 38-1, 38-2, 38-4, 38-5, 55-4 at 1-2, 5-10.

Plaintiff asserts that he completed the complaint in the instant case and submitted it for mailing as legal mail on March 30, 2015. Doc. 14 at 1. Plaintiff asserts that, according to prison rules, inmates are allowed two free legal mailings per week to ensure that inmates have access to the courts. *Id.* Instead of mailing the complaint, however, prison officials

returned it to Plaintiff two days later, indicating that he needed $.41 to mail it. *Id.* at 2. Plaintiff maintains that he had only $2.52 in his PMOD because the remaining $265.00 was intended for the USPTO payment. He was able to buy stamps from another inmate to mail the complaint, but he did not get it mailed until April 3, 2015, the due date for his USPTO fee. *Id.* Plaintiff states that he did not have funds to mail other pleadings. He states that the prison withdrew PMOD funds to pay institutional costs such as medical copay, but they refused to mail the fee to the USPTO, as Plaintiff requested. *Id.* at 4. In his amendment submitted for filing on April 8, 2015, Plaintiff asserts that "the defendants" said they "promised" to retaliate against him when he "informed them of Court action," and that "the refusal to send valid legal mail is just the beginning of their retaliation."[6] *Id.* at 4.

Carter denies that Easterling pays to mail two pieces of legal mail for inmates each week. Doc. 31-2. Instead, he says, inmates receive two stamps each week to mail legal mail in standard-sized envelopes. If the legal mail requires more postage than two stamps, the inmate can pay it from his PMOD account or furnish it. *Id.* Davenport, Bryant, Lawson, and Woods also state that the policy is to provide only two stamps per week for legal mail. Docs. 31-1, 31-3, 31-4, 31-5. They deny retaliating against Plaintiff. Docs. 31-1, 31-3, 31-4, 31-5. Wagner denies any knowledge about Plaintiff's legal mail's not being mailed, and Wagner denies retaliating against Plaintiff for any court actions he has taken.

---

[6] This case concerns Plaintiff's request to release PMOD funds to pay the USPTO fee, Plaintiff's claim that the defendants wrongfully failed to mail his complaint in this case, and Plaintiff's claim that the defendants wrongfully restricted his access to the law library. Docs. 1, 14, 15, 18. Plaintiff's other claims regarding the processing of his mail is the subject of his other lawsuit, *Youngblood v. Dunn*, 2:16-cv-00108-WHA. They will not be addressed here. Doc. 46 ("The plaintiff is advised that if he seeks to present claims with respect to the processing of mail he deems 'legal mail' he may do so by filing a separate 42 U.S.C. § 1983 action with this court.").

Doc. 31-6. Davenport states that he did not deny Plaintiff's request for fund withdrawal from his PMOD, that he did not deny Plaintiff access to the law library, and that Plaintiff "ha[d] the same opportunity to use the Law Library as the other inmates at Easterling." Doc. 25-1. Under AR 448 § V(D)(1), inmates are provided two free stamps per week for legal mail only. Doc. 55-2 at 22. According to the Inmate Handbook, inmates will be provided reasonable access to the law library, which is open twenty hours a week. Doc. 55-2 at 41.

Plaintiff avers that the USPTO dismissed Plaintiff's petition because he did not "produce legal mail logs to prove his claim that he never received legal notice to file missing parts on his pending non-provisional application for patent." Doc. 107 at 2. Plaintiff is pursuing a claim against prison officials regarding the mail logs and legal mail in *Youngblood v. Dunn*, 2:16-cv-00108-WHA. *Id.* Plaintiff states that the USPTO directed him to file a typed response instead of a handwritten response because hand lettering could not be properly scanned into the USPTO system. Doc. 107 at 3. Plaintiff states that he requested to use the law library typewriter multiple times, but Wagner and Woods said that under the revised inmate handbook, typewriters were not available under institutional rules. *Id.* Plaintiff pointed out to them a notice posted in the law library that gives inmates one hour per day to use the law library typewriter. Doc. 107 at 4. Wagner responded that the typewriter was his personal property, and Plaintiff could not use it. *Id.* at 3-4. Plaintiff avers that, despite the defendants' statements to the court, they intentionally ignored their own regulations, and denied Plaintiff use of notary services, adequate legal resources, access to

14

the court, access to government agencies, and his federal rights. *Id.* Plaintiff also states that the defendants aver that they are complying with their regulations, but Plaintiff had to file another § 1983 claim before they did. *Id.* at 4-5. Plaintiff states that he keeps incurring damages. *Id.*

## IV. DISCUSSION

### A. Absolute Immunity

Plaintiff names the Alabama Department of Corrections as a defendant. A state agency or department, as an extension of the State, is absolutely immune from suit for alleged violations of an inmate's constitutional rights. *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (holding that unless the State or its agency consents to suit, the plaintiff cannot proceed against such defendant as the action is proscribed by the Eleventh Amendment and "[t]his bar exists whether the relief sought is legal or equitable"); *see also Kentucky v. Graham*, 473 U.S. 159, 170 (1985) ("Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, however, a State cannot be sued directly in its own name regardless of the relief sought.") (citing *Alabama v. Pugh*, 438 U.S. 781 (1978) (per curiam)). The Alabama Department of Corrections is therefore due to be dismissed as a defendant.

Official capacity lawsuits are "in all respects other than name, … treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity for money damages unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity,

15

and neither has occurred in this case. *See Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for Plaintiff's claims seeking monetary damages from them in their official capacities. The claims for money damages brought against the defendants in their official capacities are therefore due to be dismissed.

## B. Declaratory and Injunctive Relief

Plaintiff's requests for declaratory and injunctive relief against the defendants are due to be dismissed as moot because Plaintiff is no longer incarcerated. The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury). Consequently, Plaintiff's request for equitable relief is moot.

## C. Qualified Immunity

The defendants assert that they are entitled to qualified immunity. Docs. 25, 31. Qualified immunity offers complete protection from civil damages for government

officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Plaintiff v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that the defendants were acting within the course and scope of their discretionary authority when the incidents complained of occurred. The plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that the defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and

citations omitted).  "Clearly established law" means (1) "a materially similar case has already been decided," (2) "a broader, clearly established principle that should control the novel facts of the situation," or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208-09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling case law is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Court of Appeals for the Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. If the plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

### 1. Payments to USPTO from the PMOD

Plaintiff claims that he had a First Amendment right to pursue his patent application, including paying fees and filing responses to the USPTO. It is undisputed that the only named defendants who had authority to grant or deny Plaintiff's requests were defendant Carter and defendant Davenport, whom Carter consulted regarding the rule against

prisoners conducting business. The defendants argue that Plaintiff admits that his invention may have commercial potential, and his actions amounted to conducting a business in violation of prison rules. Doc. 25 at 5-6.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008). Courts "afford[ ] considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Thus, prison regulations that impinge on an inmate's First Amendment rights must be "reasonably related to legitimate penological interests," and in making that determination, courts consider and balance the four factors set out in *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See Thornburgh*, 490 U.S. at 413. The four factors are (1) "whether the regulation has a valid, rational connection to a legitimate governmental interest;" (2) "whether alternative means are open to inmates to exercise the asserted right;" (3) "what impact an accommodation of the right would have on guards and inmates and prison resources; and" (4) "whether there are ready alternatives to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quotation marks omitted, citing *Turner*, 482 U.S. at 89-91). In addition to having a rational relation to a legitimate governmental interest, the regulation must be neutral. *Turner*, 482 U.S. at 89. A "court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Freeman v. Texas Department of Criminal Justice*, 369 F.3d 854,

860 (5th Cir. 2004) (interpreting the decision in *Turner* as stating that a court need not weigh evenly or even consider each of the factors as rationality is the controlling standard). "The burden … is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132.

Plaintiff does not argue that he has a right to conduct business while in prison, or that the prison rule prohibiting doing so is unreasonable. Doc. 1 at 11; *cf. Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974) (suggesting no Fourteenth Amendment problem with prison rule against conducting a business), *overruled on other grounds by Thornburgh*, 490 U.S. 401; *French v. Butterworth*, 614 F.2d 23, 24 (1st Cir.) ("a prisoner has no recognized right to conduct a business while incarcerated"), *cert. denied*, 446 U.S. 942 (1980); *see also Mallette v. Pendergrass*, 59 F.3d 175, 1995 WL 370329, *1 (9th Cir. 1995) (unpublished) ("Prison officials may prohibit an inmate from engaging in general correspondence with outsiders to promote a business."); *Johnson v. Wilkinson*, 42 F.3d 1388, 1994 WL 669857, *3 (6th Cir. 1994) (unpublished) ("Prisoners have no constitutional right to conduct business activities."); *Smith v. Umbdenstock*, 962 F.2d 11, *8 (7th Cir. 1992) (unpublished) ("an inmate has no constitutionally protected right to operate a business while incarcerated"). Instead, Plaintiff argues that his patent is his personal intellectual property, and he was attempting to protect his personal property, not conducting a business. Doc. 1 at 11.

The court concludes that when Carter refused to let Plaintiff pay the USPTO filing fee out of his PMOD account in 2015, it was not clearly established that doing so would

violate Plaintiff's First Amendment rights. There was no controlling Supreme Court or Eleventh Circuit case law on the question of inmates' pursuing patents. In *Tormasi v. Hayman*, 443 F. App'x 742 (3rd Cir. 2011) (per curiam) (unpublished), a prisoner argued that prison officials violated his First Amendment right to free speech when they confiscated his patent application pursuant to a rule prohibiting the start or operation of a business for profit or operating a nonprofit enterprise without official approval. *Id.* at 745. While the Third Circuit "generally agree[d] that the submission of a patent application does not involve a business activity in all circumstances, *see Jerry–El v. Beard*, 419 F. App'x 260, 263 (3rd Cir. 2011) (stating that 'it does not appear that exercising [the] right [to register a copyright] necessarily constitutes engaging in a business activity'), the record in this case indicates that Tormasi's conduct falls within the ambit of that prohibited by the regulation." *Tormasi*, 443 F. App'x at 745 (alterations in original). The inmate in *Tormasi* assigned his patent rights to a company for which the inmate was the sole shareholder and authorized agent, and he asserted that he was unable to benefit from his intellectual property. *Id.* at 743, 745. The court held that the district court did not err in determining that the record showed that the prisoner's intentions in pursuing the patent violated the rule against starting or operating a business for profit. *Id.* at 745 (citing *French*, 614 F.2d at 24, for the proposition that a prisoner did not have "a constitutional right to engage in business activities").

Like the inmate in *Tormasi*, it is undisputed here that Plaintiff admits that his invention has commercial potential for himself. Docs. 1 at 11, 14 at 3. Plaintiff envisions a

number of commercial uses. Doc. 1 at 4. Plaintiff contacted persons outside the prison to pay for his idea. He tried to obtain early release from prison so he could pursue and fund his patent. *Id.* at 5-7. He believes that his invention may have commercial potential. Doc. 1 at 11. Plaintiff says that the "patent could prove to be extremely valuable to plaintiff and public safety as well." Doc. 14 at 3. His actions go beyond simply protecting his property, and a reasonable official could have determined that they qualified as business activity prohibited by the prison rule. Under the circumstances of Plaintiff's case, and based on *Tormasi* and the lack of controlling precedent, it was not clearly established that denying Plaintiff's request to withdraw funds from his PMOD account and mail them to the USPTO for a patent application violated Plaintiff's right to free speech under the First Amendment. Carter's conduct, along with that of the other defendants, did not so obviously violate the Constitution that the existence of prior case law is not needed to determine whether they are entitled to qualified immunity. *See Gaines*, 871 F.3d at 1208-09 ("obvious clarity" cases are rare). Consequently, the defendants are entitled to qualified immunity on Plaintiff's claims for damages based on a First Amendment free speech violation. Summary judgment is therefore due to be granted the defendants on this issue.

## 2. Use of the Law Library and Stamps

Prisoners are entitled to "a reasonably adequate opportunity" to present claims of constitutional violations to the courts. *Bounds v. Smith*, 430 U.S. 817, 825 (1977). In *Lewis v. Casey*, 518 U.S. 343, 349 (1996), the Supreme Court extended the decision in *Bounds* and required that an inmate demonstrate the existence of an "actual injury" affecting his

effort to pursue a non-frivolous legal claim to demonstrate a denial of access to the courts. "Actual injury" means "deterrence, such as a denial or dismissal of a direct appeal, habeas petition, or civil rights case that results from actions of prison officials." *Al-Amin*, 511 F.3d at 1332 (internal quotes and citations omitted). "The limited types of legal claims protected by the access-to-courts right [are] nonfrivolous appeals from a conviction, habeas petitions, or civil rights suits." *Id.* As the Supreme Court explained in *Lewis*,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Id.* at 355; *see also Al-Amin*, 511 F.3d at 1332.

Plaintiff claims that Wagner denied Plaintiff use of the law library, which he needed to pursue his patent and this case. It is undisputed that only defendant Wagner was directly involved in the events associated with Plaintiff's claim regarding the law library. Contrary to Plaintiff's assertions, it is also undisputed on this record that prison regulations allow inmates to have only two stamps for legal mail each week, not two mailings. *See Hoppins v. Wallace*, 751 F.2d 1161, 1162 (11th Cir. 1985) (indigent inmates suffered no loss of access to the courts when they were limited to two free stamps a week). More importantly, to the extent that Plaintiff alleges a denial of access to the law library and stamps to pursue his patent application, his claims fail because the right of access to the courts does not extend to patent applications. *See Lewis*, 518 U.S. at 355 (listing types of cases protected

by the right of access to the courts). Impairment of such a claim "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*; *see also Tormasi*, 443 F. App'x at 745 n.3 (complaint about ability to pursue patent did not state access to courts claim). Even if the First Amendment did extend to patent applications, the defendants would be entitled to qualified immunity on the claim, as previously explained. Defendants are therefore entitled to summary judgment on Plaintiff's access to courts claim.

The defendants are likewise entitled to qualified immunity on the claim that the defendants retaliated against Plaintiff for trying to pursue his patent application. Prison officials may not retaliate against an inmate for exercising the right to constitutionally protected free speech. *See Crawford–El v Britton*, 523 U.S. 574, 588 n.10, 592-93 (1998); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (citations omitted). "To establish a First Amendment retaliation claim, the plaintiff must show, first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Jane Doe I v. Valencia Coll. Bd. of Trustees*, 838 F.3d 1207, 1210-11 (11th Cir. 2016) (quotation marks and citations omitted), *cert. denied sub nom. Ball v. Milward*, 137 S. Ct. 2241 (2017). Here, as previously discussed, the defendants are entitled to qualified immunity on the question of whether Plaintiff had a constitutionally protected right to mail his PMOD funds to pay for a patent

application. Consequently, Plaintiff cannot demonstrate the first element of retaliation, and the defendants are entitled to judgment as a matter of law on the issue.

### E. Respondeat Superior

To the extent Plaintiff seeks to hold certain defendants liable simply because of their supervisory positions, supervisory personnel cannot be liable under § 1983 for a constitutional violation by their subordinates via a theory of respondeat superior or on the basis of vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (doctrine of respondeat superior is inapplicable to § 1983 actions); *see also Cottone*, 326 F.3d at 1360. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for actions of correctional officials at Easterling could attach to a supervisory defendant only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions … and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Except as previously discussed, the supervisory defendants did not personally participate in or have any direct involvement with the claims made the basis of the complaint. Thus, they can be held liable for actions of other correctional officials only if their actions bear a causal relationship to the purported violations of Plaintiff's constitutional rights. To establish the requisite causal connection and avoid entry of summary judgment in favor of these supervisory defendants, Plaintiff must present sufficient evidence which would be admissible at trial of either "a history of widespread

abuse [that] put[] [the supervisory defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so …" or "a … custom or policy [that] result[ed] in [violation of his] constitutional rights, or … facts [that] support an inference that [the supervisory defendants] directed the [supervised defendants] to act unlawfully, or knew that [they] would act unlawfully and failed to stop them from doing so." *Id.* (internal punctuation and citations omitted). A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Plaintiff has not met this burden.

The record before the court contains no evidence to support an inference that the supervisory defendants directed correctional officials to act unlawfully, or knew that they would act unlawfully and failed to stop such action. In addition, Plaintiff presents no evidence of obvious, flagrant or rampant abuse of a continuing duration in the face of which the supervisory defendants failed to take corrective action. Finally, except for the rules and procedures upon which, as previously explained, the defendants are entitled to qualified immunity, it is clear that the challenged actions did not occur pursuant to a custom or policy enacted by the supervisory defendants. Thus, the required causal connection does not exist between the challenged actions of correctional officials and their supervisors, and liability under the custom or policy standard is not warranted. Based on the foregoing, summary judgment is due to be granted in favor of the supervisory defendants on Plaintiff's claims for relief based on respondeat superior.

## V. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Plaintiff's motion for summary judgment be DENIED.

2.  Defendants' motion for summary judgment be GRANTED.

3. Judgment be GRANTED in favor of Defendants.

4. This case be DISMISSED with prejudice.

5. The costs of this proceeding be taxed against Plaintiff.

It is further

ORDERED that on or before March 20, 2018, the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a de novo determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done, on this the 6th day of March, 2018.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge